**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | **Civil No. 24-152** |
| | ) | |
| CODY DUNCAN | ) | |

<u>**Opinion and Order on Motion to Suppress Wire and Electronic Interceptions**</u>

Defendant Cody Duncan is charged in an Indictment, along with seven other defendants, with conspiracy to distribute, and possess with intent to distribute, a quantity of cocaine and a quantity of fentanyl, from March 2024 to July 2024, in violation of 21 U.S.C. § 846. Presently before the Court is Mr. Duncan's Motion to Suppress Wire and Electronic Interceptions. ECF No. 288. Mr. Duncan argues that the affidavits of probable cause, supporting several warrants authorizing interception of wire and electronic communications, lack probable cause and lack the requisite statutory necessity. He also argues that the extended authorizations and renewals of the intercepts were improper and that three of the affidavits contain false or misleading statements. The government has filed a Response to the Motion, to which Mr. Duncan has filed a Reply. ECF Nos. 301, 316. After careful review of the briefs and the challenged Affidavits and Warrants, the Motion will be denied.

**I.    Background**

In September 2023, law enforcement began an investigation into members of the "Zhoove" gang and members of the "Hazelwood Mob/Down Low" gang, which were operating together, with other gangs, as a hybrid gang referred to as "The Organization." Investigators believed that the known and unknown target subjects of the investigation were part of a drug trafficking organization operating in the Allentown, Beltzhoover, and Knoxville neighborhoods of Pittsburgh, Pennsylvania. The investigation was conducted by the Federal Bureau of

Investigation, the Greater Pittsburgh Safe Streets Task Force, the Bureau of Alcohol, Tobacco, Firearms, and Explosives, the Pittsburgh Bureau of Police Narcotics Unit, the Allegheny County Sheriff's Office, and other law enforcement organizations. Initially, investigators utilized or considered using a variety of typical investigative techniques. Eventually, investigators sought approval to intercept communications to and from targeted telephones of alleged members. A summary of each of the Affidavits, seeking authorization for Title III intercepts, follows.

### 1. Initial March 5, 2024 Affidavit (Misc. No. 24-234)

FBI Special Agent Bryan Distelrath authored the relevant affidavits. The initial March 5, 2024 "Affidavit in Support of an Application for an Order Authorizing the Interception of Wire and Electronic Communications." Misc. No. 2:24-234, Gov. Ex. 1 ("Aff. 24-234")(Under Seal). Special Agent Distelrath sought authorization, pursuant to Title III, to intercept wire and electronic communications occurring to and from TARGET TELEPHONE 1 (a cellular telephone used by Cayce Williams) and to intercept wire and electronic communications to and from TARGET TELEPHONE 2 (a cellular telephone used by Curtis Williams).[1] Aff. 24-234 at ¶ 9.

In the Affidavit, Special Agent Distelrath sets forth his general background, experience, and training, with an emphasis on his experience with drug trafficking investigations, as well as his specific involvement and familiarity with the investigation of the "Zhoove" gang, and its partner gang, "Hazelwood Mob/Down Low." Aff. 24-234 at ¶¶ 1-6. He explains that law enforcement is investigating the users of two Target Telephones (Cayce Williams and Curtis Williams) as well as the following individuals: Brenden Sampson, Montre Cabbagestalk, Malik

---

[1] In addition to identifying Cayce Williams and Curtis Williams, Special Agent Distelrath identified certain other individuals and individuals as yet unknown, as persons whose wire and electronic communications to and from the Target Telephones would be authorized to be intercepted. Aff. 24-234 at ¶ 9.

Martinez, Jordan Dennis, Devante Roach, Cody Duncan, Syere Franklin, Carley Austen, Vincent Benson, Gamett Long-Parham, Brian Rigo, "and others yet unknown (the 'TARGET SUBJECTS')," who are members or associates of the Zhoove and Hazelwood Mob/Down Low gangs. Aff. 23-234 at ¶ 6. He states that the goals of the investigation are "to determine the scope of the Organization and the identities of each of its members and associates; to determine the precise manner in which their criminal organization operates; and to dismantle the Organization." Aff. 24-234 at ¶ 8.

He states that several of the above-named thirteen individuals continue to engage in narcotics trafficking despite having criminal convictions and currently being under court supervision. Aff. 23-234 at ¶ 19. Special Agent Distelrath provides the criminal history for each of the individuals. Aff. 23-234 at ¶¶ 19a.-m. Each individual is reported to have at least one criminal conviction, except for Jordan Dennis (none) and Cayce Williams (pending criminal drug charges in Allegheny County). Aff. 23-234 at ¶ 19. At the time of the Affidavit, Cody Duncan's federal criminal record reflected an August 2017 federal conviction for drug trafficking for which he was sentenced to 120 months' imprisonment. Aff. 23-234 at ¶ 19g. Mr. Duncan is also reported to have an April 2011 state conviction for drug trafficking and possession charges and an April 2022 state conviction for aggravated assault, for which he received a sentence of 27 to 54 months' imprisonment. Aff. 23-234 at ¶ 19g. Special Agent Distelrath states that Duncan "is a member of the Organization who obtains quantities of heroin/fentanyl for distribution throughout the Allentown, Beltzhoover, and Knoxville sections of Pittsburgh." Aff. 23-234 at ¶ 19.g. Special Agent Distelrath states that, if the wiretap is authorized, he expects that law enforcement will intercept Cody Duncan communicating with both Cayce Williams and Curtis Williams. Aff. 23-234 at ¶ 20-21.

In addition to relying upon his knowledge, experience, and training, Special Agent Distelrath also explains that he is specifically relying upon knowledge gained from his personal participation in the investigation, reports from other officers, and information from confidential sources,  in support of establishing probable cause to authorize the wiretap warrant. Aff. 23-234 at ¶¶ 6, 13. He also cites the investigative techniques that law enforcement has used. Such techniques include consensually authorized monitoring of meetings and telephone conversations; oral and written reports about the investigation from law enforcement; physical surveillance; use of telephone toll records and pen register/trap and trace data; debriefings of confidential informants; controlled drug purchases; GPS/E911 location data related to the Target Telephones; and financial investigation of the Target Subjects.  Aff. 23-234 at ¶ 16.

Special Agent Distelrath also reviewed the Electronic Surveillance Indices of other federal law enforcement agencies to determine whether any previous wiretap applications had been authorized to intercept the oral, wire, or electronic communications of any of the individuals, telephones, or locations. Aff. 23-234 at ¶ 22. He found that no other applications had been made for any of the "interceptees or facilities with the exception of Cody DUNCAN." Aff. 23-234 at ¶ 22. Specifically, Special Agent Distelrath explained as follows:

> Cody Duncan was named in a previous initial application signed by the Honorable Arthur J. Schwab, United States District Court Judge for the Western District of Pennsylvania on November 5, 2014. Subsequently, Duncan was named in eight additional affidavits authorizing the initial interceptions and extension of the original interception authorization granted on November 5, 2014, all of which relat[e] to the same investigation.

Aff. 23-234 at ¶ 23. The last authorized wiretap extension occurred on April 6, 2015. Aff. 23-234 at ¶ 23. It was the Indictment that arose from this Title III investigation that resulted in Mr. Duncan's August 2017 federal conviction and 120-month sentence. Mr. Duncan was released from custody on his federal sentence on February 9, 2024. Aff. 23-234 at ¶ 23.

Special Agent Distelrath also reports the details of the investigation's use of a

Confidential Source, whose background was explained as follows:

> Confidential Source 1 ("CS1") has been cooperating with law enforcement officers for approximately eight years. Over the course of CS1's cooperation with law enforcement, CS1 has participated in several large-scale investigations of DTOs [Drug Trafficking Organization]. Throughout CS1's participation in each investigation, CS1 has participated in controlled purchases of narcotics, provided historical and current information, including but not limited to, identifying target subjects, associates, residences, vehicles, and target locations. Information provided by CS1 and evidence obtained with CS1's participation has been used as probable cause in affidavits for T[itle] III wiretaps, searches of residences, vehicles, and cellular telephones. CS1's participation with law enforcement has led to the dismantlement of several DTO's, federal criminal convictions, and seizures of narcotics, firearms, and U.S. Currency. CS1 is currently motivated by the potential of receiving monetary compensation. CS1 has several prior arrests and criminal convictions, including felony convictions.

Aff. 23-234 at ¶ 25. After explaining, in general, CS1's prior convictions, Agent Distelrath

states:

> Based upon information provided to me from other agents/officers, who had prior conversations with CS1, and based upon the fact that CS1's information was corroborated through other law enforcement means, including surveillance and purchases of controlled substances, I believe that the information provided by CS1, relative to the instant investigation, is reliable.

Aff. 23-234 at ¶ 25. Finally, Agent Distelrath explains CS1's relevance to the current

investigation:

> In the Fall of 2023, CS1 was tasked with introducing themselves to members and associates of the Organization. Over the course of several months, CS1 was able to provide intelligence and purchase narcotics from several members of the Organization.

Aff. 23-234 at ¶ 26.

In support of probable cause, Special Agent DISTELRATH reported that, from

December 2023 through the date of the Affidavit (March 2024), CS1 provided the following

information to investigators:

a. CS1 confirmed to investigators that CAYCE WILLIAMS is the user of TARGET TELEPHONE 1. CS1 confirmed that CAYCE WILLIAMS is the user of TARGET TELEPHONE 1 after each controlled purchase of narcotics from CAYCE WILLIAMS by identifying him through his Pennsylvania DMV photograph, absent biographical information. CS1 identified CAYCE WILLIAMS as the user of TARGET TELEPHONE I for the first time in December 2023.

b. CS1 has contacted CAYCE WILLIAMS on TARGET TELEPHONE 1 to negotiate heroin/fentanyl and crack cocaine transactions as recently as February 2024. CS1 was able to identify CAYCE WILLIAMS through a Pennsylvania DMV photograph, absent biographical information. CS1 was utilized to conduct several controlled purchases of heroin/fentanyl and/or crack cocaine from CAYCE WILLIAMS. One of the controlled purchases will be detailed below. CSI arranged the controlled purchases by communicating with CAYCE WILLIAMS on TARGET TELEPHONE l through phone calls and text messages.

c. CAYCE WILLIAMS distributes heroin/fentanyl and cocaine base (commonly known as crack cocaine) in the Allentown sections of Pittsburgh, and surrounding areas.

d. CSI confirmed to investigators that CURTIS WLLIAMS is the user of TARGET TELEPHONE 2. CS1 has contacted CURTIS WILLIAMS at TARGET TELEPHONE 2 to negotiate heroin/fentanyl transactions as recently as February 2024. CS1 identified CURTIS WILLIAMS through a Pennsylvania DMV photograph, absent biographical information. CS1 knows CURTIS WILIAMS as "Blow". CS1 was utilized to conduct several controlled purchases of heroin/fentanyl from CURTIS WILIAMS. One of the controlled purchases will be detailed below. CS1 arranged a controlled purchase by communicating with CURTIS WILLIAMS on TARGET TELEPHONE 2 through phone calls and text messages.

e. CURTIS WILIAMS distributes heroin/fentanyl and cocaine base (commonly known as crack cocaine) in the Allentown sections of Pittsburgh, and surrounding areas.

f. CURTIS WILLIAMS utilizes runners to bring narcotics to end-users.

g. CS1 has confirmed to investigators that Syere FRANKLIN is a member or associate of the Organization. CSI provided a phone number for FRANKLIN. CSl identified FRANKLIN as "Wop," based on his Pennsylvania DMV photograph, absent biographical information.

h. FRANKLIN sells heroin/fentanyl, known as "bags", and crack cocaine to end users. FRANKIIN sells heroin/fentanyl and crack cocaine in the vicinity of E. Warrington Ave. CS I provided a telephone number that FRANKIIN utilizes to set up narcotics transactions.

i. In January 2024, CSI was utilized to conduct a controlled purchase of crack cocaine from FRANKLIN, utilizing telecommunications and text messages to arrange the transaction.

Aff. 23-234 at ¶ 41 (footnotes omitted). Special Agent Distelrath also provides detailed information regarding the arrangement of drug transactions, which information was obtained from CS1's communications conducted over TARGET TELEPHONE 1 with Cayce Williams, and TARGET TELEPHONE 2 with Curtis Williams. Aff. 23-234 at ¶ 41.

Special Agent Distelrath also provided a historical overview of the Zhoove gang, its criminal activity, and the often-violent rivalry occurring between Zhoove gang members and rival gang members. Aff. 23-234 at ¶¶ 27-40. Special Agent DISTELRATH included several specific examples of serious gun violence, and the uncooperative behavior of victims of the violence when encountered by law enforcement. Aff. 23-234 at ¶¶ 37b.-c., e.-f., i.-o.

Special Agent Distelrath stated his belief that the information he provides in the Affidavit establishes probable cause to authorize the interception of communications over the Target Telephones. With respect to the normal investigative techniques employed in the investigation, and that are expected to continue to be employed, Special Agent Distelrath avers that such techniques "are not reasonably likely to adequately accomplish the overall goals of the investigation." Aff. 23-234 at ¶¶ 59-61. Thus, Special Agent Distelrath states that he "believes that the interception of wire and electronic communications is the only available technique that has a reasonable likelihood of achieving all of the objectives of this investigation." Aff. 23-234 at ¶ 62. In support, he provides detailed facts and circumstances as to each of the normal investigative techniques used during the investigation, and the limits of each technique. Aff. 23-234 at ¶¶ 62-147. Relevant to Mr. Duncan's Motion, Special Agent relevant to Mr. Duncan's Motion explains the investigation's use of confidential sources and controlled purchases, as follows:

> Confidential Sources – other than CS1, law enforcement have been unable to cultivate confidential sources, as two potential confidential sources who had

engaged in drug transactions with a member of the gang, refused to cooperate.
Also, because CS1 was an outsider to the gang prior to meeting members, and due
to the risk of violence, they were unable to provide the kind of historical
information the investigation wanted, or any information about sources of supply,
other customers, or the location of assets and products, as asking such questions
would raise suspicion.

*See* Aff. 23-234 at ¶¶ 63-74.

Controlled Purchases – Several controlled purchases involving CS1 were
performed. Due to the isolated nature of the individual purchases, however, such
evidence will not lead to uncovering all involved members, nor would such
evidence work to hold the targets responsible for the full scope of the gang's drug
trafficking. The controlled purchases would not provide information as to who is
supplying the drugs, how often purchases are made, where funds and product are
stored, and who else is working for or with the distributor.

*See* Aff. 23-234 at ¶¶ 75-77.

Special Agent relevant to Mr. Duncan's Motion then explains that the use of the below

list of normal investigative methods would be ineffective or not likely to be useful, that the

information obtained from the use of such techniques would be of limited value, that the use of

the techniques would compromise the investigation, and/or the use of the techniques would be

dangerous:

> Physical Surveillance,
> Use of Undercover Agents,
> Search Warrants,
> Interviews (voluntarily, after arrest, or via subpoena),
> Trash Searches,
> Surveillance Cameras,
> Review of Social Media,
> GPS/E911 Location Data,
> Vehicle Tracking Devices,
> PEN Registers and Trap and Trace Devices,
> Toll Records,
> Telephone Subscriber Information,
> Mail Cover Requests, and
> Financial Investigations.

Aff. 23-234 at ¶¶ 78-147. On March 5, 2024, Judge William S. Stickman authorized the requested intercepts. Aff. 24-234 at ¶ 87.

### 2.   March 7, 2024 Affidavit (Misc. No. 24-234(a))

On March 7, 2024, Judge Stickman authorized a second Warrant to permit law enforcement's continued interception of wire and electronic communications over TELEPHONE TARGET 1 - with amended identification numbers - and TARGET TELEPHONE 2. Misc. No. 2:24-234(a), Gov. Ex. 1 (Under Seal). The March 7, 2024 Affidavit is essentially identical to the initial application for a warrant, except that Special Agent Distelrath explained that the IMSI and IMEI numbers for the telephone in the possession of, and used by, Cayce Williams had changed. Aff. 234(a) at ¶ 9.a. & p. 6  n. 3.

### 3.   April 5, 2024 Affidavit (Misc. No. 24-234(b))

A third Application, again authored by Special Agent Distelrath, seeking a Warrant for wiretap intercepts, was authorized by District Judge Robert J. Colville on April 5, 2024. Misc. No. 2:24-234(b), Gov. Ex. 1 (Under Seal). The Warrant permitted the continued interception of wire and electronic communications over TARGET TELEPHONES 1 and 2, and the initial interception of wire and electronic communications over TARGET TELEPHONE 3 (a cellular telephone used by Malik Martinez) and TARGET TELEPHONE 4 (a cellular telephone used by "Subject 1"). Aff. 24-234(b) at ¶ 9.

Special Agent Distelrath provided the supporting reasons, set forth in the previous Affidavits, to establish probable cause for the interception of communications over the Target Telephones and he incorporated by reference the prior Affidavits. He also identified new target subjects (both named and unnamed) that were not listed in the prior Affidavits. Aff. 24-234(b) at ¶¶ 19.n.-y.

In support of probable cause for the April 5, 2024 Warrant, Special Agent Distelrath included information obtained from the wire and communication intercepts previously obtained over TARGET TELEPHONE 1 and TARGET TELEPHONE 2. Aff. 24-234(b) at ¶ 32. For example, Special Agent Distelrath stated that, through the prior authorized intercepts, law enforcement confirmed that Cayce Williams used TARGET TELEPHONE 1, they identified a named source of supply of crack cocaine for Cayce Williams, they identified telephone numbers of Cayce Williams's suspected cocaine and heroin/fentanyl suppliers, and they identified two locations associated with Cayce Williams and drug transactions. Aff. 24-234(b) at ¶¶ 33, 34-36. Law enforcement also confirmed that Cayce Williams used TARGET TELEPHONE 1 to contact narcotics suppliers, including a new subject, Morisee Williams. Aff. 24-234(b) at ¶¶ 37-45. Special Agent Distelrath included transcribed portions of dated intercepted conversations between Cayce Williams and Morisee Williams and stated his professional opinion, based upon his training and experience, that said exchanges indicated illegal drug activity. Aff. 24-234(b) at ¶¶ 40-45.

Law enforcement also confirmed that Cayce Williams also used TARGET TELEPHONE 1 to *distribute* narcotics. Aff. 24-234(b) at ¶ 46. Special Agent Distelrath included transcripts of portions of intercepted communications, dated March 10, 2024, and he provided his professional interpretation of said communications. Aff. 24-234(b) at ¶¶ 46-52. Using fixed surveillance, law enforcement observed Cayce Williams on March 10, 2024, exit the front door of a known location (304 Kathleen Street) and then engage in a drug transaction with the caller he had just spoken to. Aff. 24-234(b) at ¶ 53. Special Agent Distelrath provides similar information for a different narcotics customer on a different date. Aff. 24-234(b) at ¶¶ 54-70 (March 18, 2024). He also provides information about a potential narcotics deal, that was not consummated because

Cayce Williams did not have the narcotics yet. Aff. 24-234(b) at ¶¶ 71-73 (March 27-28, 2024). Finally, Special Agent Distelrath discussed intercepted telephone calls and text message exchanges between Cayce Williams and an unidentified individual, in which they arranged a narcotics transaction wherein Cayce Williams would supply the individual with crack cocaine. Aff. 24-234(b) at ¶¶ 74-77 (March 27-28, 2024).

Similarly, with respect to TARGET TELEPHONE 2 and Curtis Williams, Special Agent Distelrath stated that, through the prior authorized intercepts, law enforcement confirmed that Curtis Williams used TARGET TELEPHONE 2, identified a named source of supply of heroin/fentanyl for Curtis Williams, and learned that Curtis Williams supplied end users with narcotics, Aff. 24-234(b) at ¶¶ 79-80. Special Agent Distelrath then, in detail, provides transcriptions of intercepted communications, explains that the communicators were arranging a narcotics transaction, and provides information from fixed surveillance demonstrating that Curtis Williams engaged in narcotics transactions. Aff. 24-234(b) at ¶¶ 81-119.

With respect to TARGET TELEPHONE 3, utilized by Malik Martinez, Special Agent Distelrath, again using transcribed conversations, text messages, and fixed surveillance, detailed the communications Martinez engaged in with Cayce Williams and, separately, with Curtis Williams, that show that Martinez is a supplier of narcotics to Cayce Williams and Curtis Williams. 24-234(b) at ¶¶ 120, 34-36. Law enforcement obtained toll records and pen register data for Target Telephone 3 that tended to show that Target Telephone 3 is used to make and receive calls to and from known and unknown telephone numbers of known and unknown associates of the Zhoove gang concerning the purchase, sale, and distribution of narcotics. 24-234(b) at ¶ 146.

### 4. April 10, 2024 Affidavit (Misc. No. 24-234(c))

On April 10, 2024, Judge Colville authorized the continued interception of TELEPHONE TARGET 1 - with an amended identification number. Misc. No. 2:24-234(c), Gov. Ex. 1 (Under Seal). Other than the amended identification number, the Affidavit of probable cause is essentially the same as what appears in the April 5, 2024 Affidavit at Misc. No. 24-234(b).

### 5. May 9, 2024 Affidavit (Misc. No. 24-234(d))

On May 9, 2024, Judge Stickman authorized the continued interception of wire and electronic communications over TARGET TELEPHONES 2 and 3, the initial interception of wire communications over TELEPHONE TARGET 5 (a cellular telephone used by Ronell Cathie), the initial interception of wire communications over TARGET TELEPHONE 6 (a cellular telephone used by Melvin Gaines), the initial interception of wire and electronic communications over TARGET TELEPHONE 7 (a cellular telephone used by Malik Martinez) and the initial interception of wire and electronic communications over TARGET TELEPHONE 8 (a cellular telephone used by Defendant Cody Duncan). Misc. No. 2:24-234(d), Gov. Ex. 1 (Under Seal).

Focusing upon moving Defendant Cody Duncan's TARGET TELEPHONE 8, Special Agent Distelrath supported probable cause to intercept communications over said telephone by, in part, referring to previously intercepted communications between Cody Duncan and Curtis Williams, over TARGET TELEPHONE 2. Aff. 24-234(d) at ¶ 133. Investigators learned that Cody Duncan and Curtis Williams were half-brothers, and that Cody Duncan had communicated with Curtis Williams on March 19, 2024, stating that he had arrived at "moms," a residence located at 304 Kathleen Street. Aff. 24-234(d) at ¶ 133. Investigators knew that Curtis Williams's and Cody Duncan's mother resided at 304 Kathleen Street, and they were also aware

that illegal drug trafficking had occurred in and around that residence as stated in prior Affidavits. Aff. 24-234(d) at ¶ 133. On March 19, 2024, through physical surveillance of the residence, law enforcement officers were able to positively identify Cody Duncan's presence at the residence. Aff. 24-234(d) at ¶ 133. Special Agent Distelrath also stated that law enforcement knew, through prior intercepts of Curtis Williams's telephone, that Cody Duncan supplies narcotics to Curtis Williams. Aff. 24-234(d) at ¶ 134.

Turning back to March 19, 2024, Special Agent Distelrath explained that intercepts of Curtis Williams's telephone showed that he had informed customers that he was out of stock of a certain unknown narcotic, but that he expected to be back in stock that evening. Aff. 24-234(d) at ¶ 135; 136-139. Special Agent Distelrath averred that, on the evening of March 19, 2024, Curtis Williams did acquire unknown illegal narcotics from Cody Duncan. Aff. 24-234(d) at ¶¶ 140, 148. He supported this belief with intercepted communications between Curtis Williams and an individual named Benson and with intercepted communications between Curtis Williams and Cody Duncan. Aff. 24-234(d) at ¶ 141-150. Additional intercepted communications demonstrated that Cody Duncan was supplying narcotic to Curtis Williams. Aff. 24-234(d) at ¶¶ 166-167; 170-171. Law enforcement also learned that Cody Duncan was likely supplying narcotics to Cayce Williams. Aff. 24-234(d) at ¶ 163.

Special Agent Distelrath then explains the normal investigative techniques that law enforcement have used, and that will continue to be used, but avers that "the interception of wire and electronic communications is the only available technique to achieve the objectives of this investigation." Aff. 24-234(d) at ¶ 177. He provides detailed facts and circumstances of the normal investigative techniques that have been used, and their limitations, but that are "not

reasonably likely to adequately accomplish the overall goals of the investigation." Aff. 24-234(d) at ¶¶ 178-260.

### 6. June 18, 2024 Affidavit (Misc. No. 24-234(e))

Finally, on June 18, 2024, Judge Stickman authorized the continued interception of wire and electronic communications over TARGET TELEPHONE 2 (Curtis Williams) and TARGET TELEPHONE 3 (Martinez), the continued interceptions of wire communications, and the initial interception of electronic communications, over TARGET TELEPHONE 6 (Gaines), the continued interception of wire and electronic communications over TELEPHONE TARGET 8 (Duncan), and the initial interception of wire communications over TARGET TELEPHONE 9 (Subject 4) and TARGET TELEPHONE 10 (Olive). Misc. No. 2:24-234(e), Gov. Ex. 1 (Under Seal).

Special Agent Distelrath authored the Affidavit in support of probable cause and incorporated by reference all of his prior related Affidavits. With respect to Cody Duncan, Special Agent Distelrath again stated that Duncan uses TARGET TELEPHONE 8 to supply other members and associates of the Organization with narcotics. Aff. 24-234(e) at ¶ 155. He states that "investigators have determined through interceptions and fixed surveillance that [an alleged conspirator] is utilizing [their] residence, [] to distribute narcotics on behalf of CAYCE WILLIAMS, DUNCAN, and others, as well as allowing other members and associates of the Organization to process, package, and redistribute narcotics at [the] residence." Aff. 24-234(e) at ¶ 155. On May 20, 2024, and again on May 21, 2024, fixed surveillance of this residence showed Duncan, and others, enter and exit the identified residence, and they observed what appeared to be a narcotics transaction. Aff. 24-234(e) at ¶¶ 157-165.

Investigators also learned that Cody Duncan directed persons he was communicating with to switch to an encrypted application, such as FaceTime or Signal, to communicate. Aff. 24-234(e) at ¶¶ 166-168; 173-180. Special Agent Distelrath also recounted other intercepted communications indicating illegal drug conversations and activity. Aff. 24-234(e) at ¶¶ 169-172; 182-185 (among other examples).

The investigation concluded in July 2024 upon the execution of several search warrants. The Grand Jury returned an Indictment on July 16, 2024. Mr. Duncan was arrested on July 19, 2024.

## II.    The Wiretap Law

Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2510 *et seq.*, permits the interception of wire, oral, and electronic communications by law enforcement, "if the judge determines on the basis of the facts submitted by the applicant," that

> (a) there is probable cause for belief that an individual is committing, has committed, or is about to commit a particular [enumerated] offense;
>
> (b) there is probable cause for belief that particular communications concerning that offense will be obtained through such interception;
>
> (c) normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous;
>
> (d) there is probable cause for belief that the facilities from which, or the place where, the wire, oral, or electronic communications are to be intercepted are being used, or are about to be used, in connection with the commission of such offense, or are leased to, listed in the name of, or commonly used by such person.

18 U.S.C. § 2518(3)(a)-(d). The statute dictates that the wiretap application itself must contain "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c). Thus, the issuing judge must not only find probable cause to believe an offense is being committed and that communications concerning that offense will be

obtained through the interception, but also the judge must find probable cause to believe that a wiretap is necessary, which requires that the application explain why "normal investigative techniques would be of no avail." *United States v. Garvey*, 588 F. App'x 184, 190 (3d Cir. 2014) (citing *United States v. Hendricks*, 395 F.3d 173, 180 (3d Cir. 2005)). Extensions of a previously authorized wiretap require the same showing as an initial application. 18 U.S.C. § 2518(5). Thus, the same determinations as to probable cause and necessity must be made as to each application for an extension. *United States v. Williams*, 124 F.3d 411, 428 (3d Cir. 1997).

### III.    Discussion

Mr. Duncan argues that all evidence derived directly or indirectly from the wiretap authorizations must be suppressed. First, he argues that the relevant Affidavits lack sufficient probable cause to justify the authorization of the wiretap intercepts. Second, he argues that the Warrants permitting law enforcement to intercept communications over the Target Telephones were obtained in violation of the wiretap law's "necessity requirement." Third, Mr. Duncan argues that the wiretap authorizations, dependent upon extensions and renewals of prior authorizations and related Affidavits, must be suppressed because the relevant Affidavits fail to independently demonstrate probable cause and necessity. Finally, he argues that false and/or misleading statements render three of the Affidavits invalid under *Franks v. Delaware*, 438 U.S. 154 (1978). *See* Misc. Nos. 24-234, 24-234(d), and 24-234(e).

### A.  Probable Cause

The Fourth Amendment of the United States Constitution protects against unreasonable searches and seizures , in part, by requiring that all search warrants be supported by probable cause. When making a probable cause determination, a magistrate judge must ascertain "whether there is a 'fair probability that contraband or evidence of a crime will be found in a particular

place.'" *United States v. Conley*, 4 F.3d 1200, 1205 (3d Cir.1993) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983) (internal citations omitted)). The Supreme Court requires that the issuing magistrate "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information," that there is probable cause to support a warrant. *Gates*, 462 U.S. at 238.

"'Direct evidence linking the place to be searched to the crime is not required for the issuance of a search warrant.'" *United States v. Hodge*, 246 F.3d 301, 305 (3d Cir. 2001) (quoting *Conley*, 4 F.3d at 1207). "'Instead, probable cause can be, and often is, inferred by "considering the type of crime, the nature of the items sought, the suspect's opportunity for concealment and normal inferences about where a criminal might hide" the fruits of his crime.'" *Hodge*, 246 F.3d at 305 (quoting *United States v. Jones*, 994 F.2d 1051, 1056 (3d Cir. 1993)) (quoting *United States v. Jackson*, 756 F.2d 703, 705 (9th Cir. 1985)). An "issuing court need only conclude that it would be reasonable to seek the sought-after objects in the place designated in the affidavit; a court need not determine that the evidence is in fact on the premises." *United States v. Ritter*, 416 F.3d 256, 263 (3d Cir. 2005) (citing *Conley*, 4 F.3d at 1205) (other citations omitted).

"The duty of a reviewing court is simply to ensure that the magistrate had a 'substantial basis for ... conclud[ing]' that probable cause existed." *Gates*, 462 U.S. at 236 (quoting *Jones v. United States*, 362 U.S. 257, 271 (1960)). Reviewing courts must not "simply rubber stamp a magistrate's conclusions." *United States v. Tehfe*, 722 F.2d 1114, 1117 (3d Cir. 1983). However, the United States Supreme Court has directed that "resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants." *Conley*, 4.

F.3d at 1205 (quoting *United States v. Ventrusca*, 380 U.S. 102, 109 (1965) (quoted with approval in *Gates*, 462 U.S. at 237 n.10)).

These same Fourth Amendment principles apply equally to the probable cause inquiry for authorizing a wiretap. *See Tehfe*, 722 F.2d at 1118. Accordingly, challenged orders authorizing a wiretap must be upheld so long as there is a substantial basis for concluding that an offense was being committed, that communications concerning that offense would be obtained through the wiretap interception, and that the telephone from which the communications were to be intercepted was being used in connection with that offense. 18 U.S.C. § 2518(3). Section 2518(3)(a) of Title 18 requires that the reviewing judge determine that "there is probable cause for belief that an individual is committing, has committed, or is about to commit a particular [enumerated] offense." 18 U.S.C. § 2518(3)(a). Subsection (b) of the statute requires that the reviewing judge determine that "there is probable cause for belief that particular communications concerning that offense will be obtained through such interception." 18 U.S.C. § 2518(3)(b).

Mr. Duncan contends that the Affidavits lack probable cause, because they relied upon ambiguous and unsubstantiated gang affiliations. He also argues that probable cause is lacking, because the Affidavits improperly relied upon the Special Agent's interpretation of ambiguous, but plausibly innocent, intercepted communications. Mr. Duncan further argues that the averments as a whole are general, stale, or are dependent upon coincidence. Specifically, Mr. Duncan argues that the averments, reporting that Mr. Duncan was observed by physical surveillance entering and exiting a residence after he communicated with Curtis Williams about arranging to meet, is entirely innocent behavior. Finally, Mr. Duncan specifically argues that the Affidavits' references to the use of encrypted messaging platforms does not establish illegal activity.

Focusing first on the initial Affidavit, and as detailed in the factual background section, Special Agent Distelrath provided information he has learned from his training and experience in investigating illegal narcotics trafficking. Such experience includes, but is not limited to, his involvement in the execution of narcotics-related search warrants and his involvement in narcotics-related arrests. He states that he has experience in multiple wiretap investigations and has reviewed thousands of communications between drug traffickers. He has also engaged in hundreds of conversations with drug trafficker and drug users about the methods and language used by narcotics traffickers. As a result of his experience, he is familiar with the methods, language, traits, habits, and terminology used by drug traffickers to distribute narcotics, launder proceeds, and to operate a drug trafficking conspiracy. Special Agent Distelrath goes on to explain his knowledge of numerous different aspects of a drug trafficking organization, including the "indispensable" use of cellular telephones to further the organization's activities.

In an introductory paragraph, Special Agent Distelrath states that he is participating in a narcotics-trafficking investigation of thirteen named individuals, including Mr. Duncan. He states that the individuals are members of, or associates of, several neighborhood street gangs (such as Zhoove or Hazelwood Mob/Down Low) collectively known as the Organization. He also states the areas of Pittsburgh in which the Organization is operating. Such averments are the beginning point for the Affidavit and explain to the reviewing Judge the "who, what, and where" of the investigation. A Judge reviewing the Affidavit is entitled to accept that the affiant accurately reports the identity of the targets of the investigation, the crimes being investigated, and the locations where the criminal activity is occurring.

From these introductory paragraphs, Special Agent Distelrath identifies Curtis Williams and Cayce Williams as the users of the two initial targeted telephones. The investigation expects

that Mr. Duncan, a suspected member or associate, will communicate with both of these target telephones to further the Organization's drug trafficking. In support of establishing probable cause, Special Agent Distelrath states that the information in the Affidavit is based, in part, upon information gained from consensually authorized monitoring of meetings and telephone conversations; oral and written reports about the investigation (and other investigations) from other law enforcement officers; physical surveillance; telephone toll records and pen register/trap and trace data; independent investigations by the FBI, the ATF, the Pittsburgh Police, and the Allegheny County Sheriff's Office; debriefings of confidential informants and witnesses; controlled drug purchase; GPS/E911 location date relating to the target telephones; and FBI Forensic Accountants' investigation into the Target Subjects' finances.

Special Agent Distelrath specifically itemizes the criminal history of the two users of the target telephones, Curtis and Cayce Williams, as well as the other target subjects. With respect to Mr. Duncan, Special Agent Distelrath states that Mr. Duncan's role in the Organization is obtaining quantities of heroin/fentanyl for distribution throughout Allentown, Beltzhoover, and Knoxville sections of Pittsburgh. Mr. Duncan's relevant federal drug conviction in August 2017 is also reported. That federal conviction was the result of a wiretap investigation that resulted in the indictment of several individuals involved in a similar large-scale drug distribution organization.

Mr. Duncan argues that the reference to his 2017 criminal conviction is stale and therefore should not be relied upon to establish probable cause. Mr. Duncan was sentenced to a lengthy term of imprisonment of 120 months, and he was released from custody on February 9, 2024, five months after the investigation began. Aff. 24-234 at ¶ 23. Mr. Duncan's federal conviction is relevant in the context of the Affidavit because a reviewing judge would want to

know that Mr. Duncan had previously engaged in the same illegal activity under investigation. The conviction is not stale under the circumstances. Mr. Duncan was in custody prior to his being identified as a target of the current investigation, and he was in the community for less than one month before Special Agent Distelrath authored the Affidavit. Therefore, while he was in custody, he was not participating in the Organization's illegal activities, and he could not have committed crimes in the community that could have been reported in the Affidavit. A reviewing Judge could properly consider the fact that Mr. Duncan, who had just been released from custody, is again under investigation for acts connected with a drug distribution organization. This explanation, that Mr. Duncan was in federal custody until February 9, 2024, also answers Mr. Duncan's question as to why the initial Affidavit stated specific, and current, gang-related criminal activity of other target subjects, but did not do so with Mr. Duncan. It is because he was in custody and was unable to participate  gang-related criminal activity.

Next, Mr. Duncan argues that probable cause is lacking in both Affidavit 234(d) and 234(e), which authorized the initial and continuing interceptions of Mr. Duncan's telephone, TARGET TELEPHONE 8. Mr. Duncan argues that the Special Agent's interpretation of communications between Mr. Duncan and Curtis Williams, followed by a meeting at 304 Kathleen Street, attributed illegal drug activity to entirely innocent communications and activities. The activity in question occurred on the evening of March 19, 2024, between 7:04 p.m. and 7:49 p.m. *See* Aff. 24-234(d) at ¶¶ 141, 143, 145, 147. The conversations and text exchanges between Duncan and  Curtis Williams do not mention drugs or any other illegal activity. At one point, Mr. Duncan tells Curtis Williams that he is going to "moms," which is a refence to the residence at 304 Kathleen Street. Shortly after this exchange, the two men

separately arrive at the residence within minutes of each other. Approximately fifteen minutes later, each had left the house.

   While it is true that there is no explicit discussion between Mr. Duncan and Curtis Williams about engaging in a drug transaction, Mr. Duncan fails to consider the activities that came before and after the challenged communications, the history of the use of 304 Kathleen Street, and Mr. Duncan's atypical behavior before entering the house and after leaving the house. Before the meeting at 304 Kathleen Street took place, Vince Benson communicated with Curtis Williams about Benson's desire to purchase narcotics from Curtis Williams. Aff. 24-234(d) at ¶¶ 136-139. The communication exchanges between Curtis Williams and Benson show the following: Benson wanting to obtain narcotics from Curtis Williams; Curtis Williams wanting to provide narcotics to Benson; Benson planning to pay a portion of the cost for delivery of new narcotics, while also making a payment for narcotics he had previously received; and Curtis Williams explaining that, although he does not presently possess narcotics, he expects to obtain a new supply shortly. Special Agent Distelrath, based upon his experience and training, offered a detailed interpretation of the exchanges, concluding that Benson and Curtis Williams intended to engage in a drug transaction, but they could not until Curtis Williams is resupplied with new quantities of a narcotic.

   With respect to the meeting at 304 Kathleen Street, law enforcement observed Curtis Williams arrive at 7:33 p.m. and enter the house. At 7:35 p.m. they observed Mr. Duncan arrive at the residence, walk around the left side of the house behind a fenced area out of sight of the surveillance camera, and then immediately return to the front of the house and enter the front door. Seven minutes later Curtis Williams exited the residence and left. Five minutes after Curtis Williams left, Mr. Duncan was observed leaving the residence and again he walked around the

left side of the house, out of sight, before entering his car and leaving. The entire process took

fourteen minutes, with Curtis Williams and Mr. Duncan in the house together for seven minutes.

After the meeting at "moms," as reported in the Affidavit, is evidence showing that Curtis

Williams arranged to meet with Benson and provide him with narcotics. Aff. 24-234(d) at ¶¶

149-157. From the activity that the agents intercepted and observed on March 19, 2024, and

continuing into the early morning hours of March 20, 2024, Special Agent Distelrath stated:

> Your Affiant believes that CURTIS WILIAMS was unable to supply BENSON
> with both heroin/fentanyl and crack cocaine on March 19,2024. After
> communications between DUNCAN and CURTIS WLLIAMS and surveillance
> agents observing CURTIS WILIAMS and DUNCAN inside 304 Kathleen Street
> at the same time, CURTIS WILLIAMS then appears to have a supply of both
> heroin/fentanyl and crack cocaine. Your affiant believes, based on my knowledge
> of the investigation, that DUNCAN supplied CURTIS WILLIAMS with an
> additional quantity of controlled substance at304 Kathleen Street.

Aff. 24-234(d) at ¶ 158. A judge reviewing the above averments could reasonably conclude that:

- Curtis Williams arranged to sell drugs to Benson,
- Curtis Williams contacted Mr. Duncan in order to arrange a time and place
  to meet so that Curtis Williams could obtain a supply of narcotics to sell to
  Benson,
- the two met at "moms" where Mr. Duncan supplied Curtis Williams with
  narcotics, and
- Curtis Williams met with Benson to provide him with narcotics.

In addition, a reviewing judge could reasonably consider Mr. Duncan's atypical behavior before

and after entering the house, that suggests that Mr. Duncan picked up or dropped off some item,

both before he entered house and then again, before he left the property. The fact that Curtis

Williams then goes on to engage in a narcotics transaction with Benson only solidifies the

conclusion that Curtis Williams obtained narcotics from Mr. Duncan. Contrary to Mr. Duncan's

challenge to probable cause, the averments concerning Curtis Williams, Benson, and Mr. Duncan

are not speculative or conclusory or indicative of entirely innocent behavior.

In Affidavit 234(e), Special Agent Distelrath states that Mr. Duncan uses another person's apartment to package and distribute narcotics. After Mr. Duncan had visited the apartment on May 20, 2024 for a short time, the resident of the apartment immediately ordered Mr. Duncan to come back to the apartment to clean up a mess he had left on the table. On May 21, 2024, the resident was observed handing a plastic knotted baggie over to an unknown male. Special Agent Distelrath stated that he believed that the resident supplied the unknown male with narcotics provided to the resident by Mr. Duncan. Aff. 24-234 at ¶¶ 155-165. Such averments properly contribute to a conclusion that probable cause has been established.

With respect to encrypted commination methods, intercepted communications to and from Mr. Duncan's telephone revealed that he would ask those he was communicating with to switch to FaceTime or Signal. Aff. 24-234(e) at ¶ 166-181. Special Agent Distelrath states in the Affidavit that "your Affiant knows that narcotics traffickers utilize applications, such as Facetime and Signal, where instant messaging, voice calls, and video calls are encrypted. Narcotics traffickers utilize applications such as these to thwart law enforcement." Aff. 24-234(e) at ¶ 166.  Mr. Duncan argues that the use of such applications is not evidence of illegal activity. He is correct, but again, the reviewing judge considers the entire Affidavit as a whole, to determine, under the totality of the circumstances, if probable cause has been established to justify the use of wiretaps. Considering the totality of the circumstances, Special Agent Distelrath's conclusion that Mr. Duncan was using encrypted applications to discuss illegal activity with others is a reasonable, and plausible, conclusion, given the evidence reported in the Affidavit.

Judge Stickman's and Judge Colville's respective findings that probable cause supported the authorization of the requested Title III intercepts, and their findings that the wiretaps were

necessary under 18 U.S.C. § 2518, are entitled to deference. *United States v. Gilliam*, No. 02:12-CR-93, 2015 WL 5178197, at *14 (W.D. Pa. Sept. 4, 2015) (citing *Conley*, 4 F.3d at 1205 and *Gates*, 462 U.S. at 237. Special Agent Distelrath's Affidavits provide abundant information, obtained from the investigation as it progressed, to support probable cause to authorize the interception of communications to and from the Target Telephones. Mr. Duncan's broad objections fail to undermine the Judges' determinations that probable cause existed to authorize each of the Title III intercepts. A review of the Affidavits shows that Judge Stickman and Judge Colville had a substantial basis for concluding that probable cause existed to authorize the wiretap applications. The Court finds that a judge reviewing the Affidavits in a commonsense manner and considering all the circumstances would conclude that probable cause had been established to authorize the Title III Wiretaps.

### B.    The Necessity Requirement

Mr. Duncan next argues that the wiretap Warrants were obtained in violation of the wiretap law's "necessity requirement." 18 U.S.C. §§ 2518(1)(c) & (3)(c). "The statute governing the authorization of wiretaps, Title III, requires the government to demonstrate necessity when applying for wiretap authorization." *United States v. Bailey*, 840 F.3d 99, 113–14 (3d Cir. 2016). "The purpose of the necessity requirement is 'to make doubly sure that the statutory authority be used with restraint and only where the circumstances warrant the surreptitious interception of wire and oral communications.'" *Id.* at 114 (quoting *United States v. Giordano*, 416 U.S. 505, 515 (1974)). The Third Circuit "has acknowledged that '18 U.S.C. § 2518(3)(c) does not require the government to exhaust all other investigative procedures before resorting to electronic surveillance.'" *Id.* (quoting *Williams*, 124 F.3d at 418). "The government need only lay a factual predicate sufficient to inform the judge why other methods of investigation are not sufficient."

*Williams*, 124 F.3d at 418. "[I]n determining whether th[e necessity] requirement has been satisfied, a court 'may properly take into account affirmations which are founded in part upon the experience of specially trained agents.'" *Id.* (quoting *United States v. Ashley*, 876 F.2d 1069, 1072 (1st Cir.1989)). "The statutory requirement that 'normal investigative procedures' be first exhausted, must be reviewed in a 'practical and common sense fashion.'" *United States v. Armocida*, 515 F.2d 29, 37 (3d Cir. 1975) (quoting 1968 U.S. Code Cong. & Admin. News at p. 2190).

With respect to the necessity requirement, Special Agent Distelrath explained that the normal investigative techniques that have been employed in the investigation, and that will continue to be employed, are not reasonably likely to adequately accomplish the overall goals of the investigation. Aff. 24-234 at ¶¶ 59-61. Therefore, he "believes that the interception of wire and electronic communications is the only available technique that has a reasonable likelihood of achieving all of the objectives of this investigation." Aff. 24-234 at ¶ 62. As recounted above, Special Agent Distelrath provides detailed facts and circumstances as to each of the normal investigative techniques, and the limits thereof, that have been used in the investigation. Aff. 24-234 at ¶¶ 62-147.

Mr. Duncan only challenges Special Agent Distelrath's explanation of use of confidential sources and controlled purchases and argues that the averments fail to show that such "methods of investigation are not sufficient." *Williams*, 124 F.3d at 418. He argues that a reviewing judge could not rely upon Special Agent Distelrath's conclusory statement that it is unlikely that confidential sources would be able to infiltrate the Organization. In support, he argues that the Special Agent did not provide additional information as to why developing a source was difficult

or impossible. Finally, he argues that, given the success of controlled buys with CS1, the claim that additional controlled buys cannot lead to sufficient information is premature and speculative.

As detailed by Special Agent Distelrath, CS1's participation in controlled purchases provided significant information in furtherance of the investigation. Aff. 24-234 at ¶¶ 25-26, 41. CS1 was not known to the Target Subjects or other gang members prior to Fall 2023, when CS1 first introduced themselves to members and associates of the Organization. Special Agent Distelrath explained that CS1's status as an "outsider" limited CS1's ability to obtain relevant historical information, supplier information, customer information, and information identifying places where money and narcotics were stashed. CS1's ability to gain relevant information was limited because, as an outsider, asking such questions would raise suspicion as well as raise the possibility of violence against CS1. Moreover, two potential confidential sources, who had engaged in drug transactions with a gang member, refused to cooperate. Special Agent Distelrath sufficiently explained that the insular nature of the Organization, combined with its demonstrated propensity to use violence, work to make it difficult to infiltrate the Organization with confidential sources and to conduct controlled purchases.

Special Agent Distelrath presents a well-reasoned explanation as to why the use of controlled sources is unlikely to provide the investigation the kinds of specific, and heavily guarded, information needed to further the investigation. Further, Special Agent Distelrath presents a factually supported conclusion that the use of controlled sources presents a very real risk of violence to any source. Specifically, he has demonstrated that the Organization is secretive, insular, and prone to violence, which are characteristic of a criminal conspiracy that make using a confidential source (or conducting additional controlled purchases) unlikely to be

productive. Therefore, Special Agent Distelrath has established the need to use wiretap intercepts to further the investigation with respect to confidential source and controlled buys.

With respect to the use of other investigative techniques, it is significant that law enforcement was investigating a large-scale drug conspiracy involving at least two gangs who had merged for the purposes of illegal drug trafficking. Thus, the scope of the conspiracy encompassed numerous individuals, different means and methods of conducting the conspiracy, and the use of multiple locations. "[W]here the government investigation targets a large conspiracy and the individuals whose communications will be intercepted are members of that conspiracy, the necessity requirement relates to the demonstrated or probable inadequacy or danger of other investigative techniques to achieve the specific goals pursued by the investigation at hand." *United States v. Ellis*, 693 F. App'x 137, 139-40 (3d Cir. 2017) (citing *Bailey*, 840 F.3d at 114–15)). The Third Circuit has also concluded that, in evaluating affidavits involving investigation of large conspiracies, the necessity requirement is satisfied by the affiant showing, among other things, "the difficulty of penetrating an organization with a secretive nature and a propensity towards violence." *Williams*, 124 F.3d at 418. Even where, like here, law enforcement was able to conduct controlled purchases, the Third Circuit has permitted wiretap interceptions of a suspect's telephone, explaining that "arresting [him] alone would have frustrated the goals of the broader investigation." *Bailey*, 840 F.3d at 114–15.

The Court finds no violation of the "necessity requirement" of section 2518. Special Agent Distelrath detailed why each of the normal investigative techniques would be ineffective, impractical, and/or dangerous (considering the goals of the investigation). The fact that the investigation had successfully employed normal investigative techniques during the course of the investigation does not lead to the conclusion that such techniques should be used to the exclusion

of electronic surveillance. Here, Special Agent Distelrath was forthright in detailing the investigative techniques that had been used and he pointed out instances where such methods were successful. However, he also clearly explained the reasons why such techniques were not likely to continue to be successful, would only marginally succeed, would compromise the investigation, or would be dangerous. The Court finds that the facts and circumstances, set forth in the Affidavits, sufficiently establish that normal investigative techniques would have been ineffective and/or too dangerous. *Ellis*, 693 F. App'x at 139 (affidavit must describe facts and circumstances surrounding the investigation that establish a "factual predicate" sufficient to allow the issuing court to determine such techniques will likely be unsuccessful or too dangerous) (citing *United States v. McGlory*, 968 F.2d 309, 345 (3rd Cir. 1992)).

## C. Extensions and Renewals of Previously Authorized Wiretaps

Mr. Duncan argues that subsequent authorizations to extend or renew a wiretap must be suppressed, because the relevant Affidavits fail to independently demonstrate cause and necessity. "Extensions of an order may be granted, but only upon application for an extension made in accordance with subsection (1) of this section and the court making the findings required by subsection (3) of this section." 18 U.S.C. § 2518(5). Subsection 2518(1) provides the requirements that must be included in an affidavit seeking a Title III wiretap. Subsection 2518(3) provides the requirements that a judge must find in order to authorize the wiretap. Therefore, as Mr. Duncan states, an extension must independently satisfy the probable cause and necessity requirements to permit authorization of the extension.

Mr. Duncan argues that the Affidavits in support of the extensions and renewals fell short of independently establishing probable cause and necessity. However, his argument rests entirely upon his prior arguments that probable cause and necessity were lacking from the initial and

subsequent Affidavits. The Court has determined that the Affidavits provide sufficient probable cause and that the necessity requirement has been met. Therefore, the argument that renewed and extended authorizations are not legally justified, fails.

### D. False and/or Misleading Statements

Finally, Mr. Duncan argues that false and/or misleading statements render three of the Affidavits (24-234, 24-234(d), and 24-234(e)) supporting the issuance of wiretap intercepts, invalid. He contends that the Affidavits contain a materially false statement and/or a materially misleading statement, which renders the warrant invalid under *Franks v. Delaware*, 438 U.S. 154 (1978). Specifically, he contends that the statement in the Affidavits, that Mr. Duncan was actively involved in gang-related activity and had ties to criminal organizations, was false, or it was based upon outdated information, and it was unsubstantiated. He also argues that the statement is misleading and amounts to a reckless misrepresentation of Mr. Duncan's criminal activity and affiliations.

"The Fourth Amendment prohibits the intentional or reckless inclusion of a material false statement (or omission of material information) in a search-warrant affidavit." *United States v. Pavulak*, 700 F.3d 651, 665 (3d Cir. 2012), citing *United States v. Yusuf*, 461 F.3d 374, 383–84 (3d Cir. 2006). "To obtain a Franks hearing, a defendant must establish (1) that a warrant application contained false statements made with reckless disregard for the truth and (2) that the remaining truthful statements, standing alone, do not establish probable cause." *United States v. Desu*, 23 F.4th 224, 234 (3d Cir. 2022) (citing Franks, 438 U.S. at 171–72). "The defendant must prove his allegations by a "substantial preliminary showing."" *Desu*, 23 F.4th at 234 (quoting Franks, 438 U.S. at 171–72). "To carry his burden, [the defendant] cannot 'rest on mere conclusory allegations or a "mere desire to cross-examine," but rather must present an offer of

proof contradicting the affidavit, including materials such as sworn affidavits or otherwise reliable statements from witnesses." *Desu*, 23 F.4th at 234 (quoting *Yusuf*, 461 F.3d at 383 n.8) (quoting *Franks*, 438 U.S. at 171). "If a defendant succeeds in obtaining a hearing, he must then prove the allegations by a 'preponderance of the evidence' at the hearing itself in order for a judge to suppress evidence obtained as a result of the warrant." *Desu*, 23 F.4th at 234 (quoting *Franks*, 438 U.S. at 156). "'[O]missions are made with reckless disregard for the truth when an officer recklessly omits facts that any reasonable person would know that a judge would want to know.'" *Desu.* 23 F.4th at 234 (quoting *Wilson v. Russo*, 212 F.3d 781, 783 (3d Cir. 2000)). "'[A]ssertions are made with reckless disregard for the truth when an officer has obvious reasons to doubt the truth of what he or she is asserting.'" *Desu*, 23 F.4th at 234 (quoting *Wilson*, 212 F.3d at 783). If a defendant succeeds in establishing that that there were false assertions or reckless omissions of fact, the defendant must then demonstrate that such assertions or omissions were "material, or necessary, to the finding of probable cause." *Sherwood v. Mulvihill*, 113 F.3d 396, 399 (3rd Cir. 1997).

Special Agent Distelrath stated that Mr. Duncan is a member of the Organization who obtains quantities of heroin/fentanyl for distribution throughout the Allentown, Beltzhoover, and Knoxville sections of Pittsburgh. Aff. 24-234 at ¶ 19.g. As stated above, Special Agent Distelrath identified that Mr. Duncan had been the target of a 2015 Title III investigation into a similar large-scale gang-related drug distribution conspiracy. Mr. Duncan was arrested, convicted, and sentenced to 120 months' imprisonment for that illegal activity. Thus, when the investigation into the Organization began in the fall of 2023, Mr. Duncan was in federal custody. In early February 2024, Mr. Duncan was released from custody and, a reasonable conclusion from the averments in the Affidavit is that he immediately began engaging in illegal activity with the

Organization. Special Agent Distelrath noted that several of the individuals he had "identified as members and/or associates of Zhoove, Hazelwood Mob/Down Low Gang, and/or Arlington Heights 3200 Gang," engaged in illegal drug trafficking "despite having already been convicted of federal and state violations, including felony drug trafficking, firearms offenses, and other violent crimes." Aff. 23-234 at ¶ 27. That statement encompasses Duncan as he was on federal supervision at the time the Affidavit was written. In addition, the investigation confirmed that Mr. Duncan was related to Curtis Williams. A reviewing judge could reasonably conclude that Mr. Duncan, a recently released convict who had previously engaged in a large-scale drug distribution conspiracy, was presently engaging in illegal drug trafficking, along with his half-brother Curtis Williams. Such a conclusion is not based upon a false or outdated statement about Mr. Duncan's criminal history or gang-related activity. As for the argument that the Mr. Duncan's reported criminal history is outdated, the Court has already addressed the fact that Mr. Duncan's 2017 conviction caused him to be detained in custody until February 2024, just before Special Agent Distelrath drafted his March 5, 2025 Affidavit. Thus, the age of his prior conviction is a circumstance entirely due to Mr. Duncan's criminal activity and resulting sentence.

The averments provided by the Special Agent, along with the logical inferences from all the averments, could reasonably lead a reviewing judge to reasonably conclude that Mr. Duncan is presently engaged in illegal activity with a gang-related drug distribution organization. The Court concludes that none of the language in the Affidavit referring to Mr. Duncan's criminal history or him being a member or associate of one of the drug distribution gangs is false, misleading, or stale. Therefore, the Court finds that there is no false or misleading statement in violation of *Franks*.

32

IV.    **Conclusion**

For the reasons explained above, the Court finds that the issuance of the six wiretap authorizations were supported by probable cause and necessity for the wiretaps had been established. Similarly, the Court finds that probable cause supported the wiretap extensions and renewals and that there were no material omissions and/or misrepresentations in the Affidavits. Accordingly, Mr. Duncan's Motion will be denied. An appropriate Order follows. are resolved as stated below.

<u>**ORDER**</u>

AND NOW, this 11th day of August 2025, for the reasons explained above, Cody Duncan's Motion to Suppress Wire and Electronic Interceptions , ECF No. 288, is DENIED.

_____
Marilyn J. Horan
United States District Court Judge